*10 The facts sufficiently appear in the opinion of the referee, which was as follows :
G-eobg-e C. Hall, Referee.
The first question to be determined in this case is whether the action can be maintained at all in respect to the plaintiffs’ bill for extra work. The contract provided that, “should any dispute arise respecting the true value of the extra work or of the works omitted, the same shall be valued by two competent persons, one employed by the owner ■and the other by the contractor, and those two shall have power to name an umpire, whose decision shall be binding on all parties.” Early in the reference the defendant’s counsel objected to any proof by the plaintiff in regard to the extra work, because of the provision of the contract above quoted, but the objection was overruled on the ground that an unexecuted agreement to arbitrate is not a bar to an action upon the subject in controversy. As a general rule this principle is well settled, and the case of Hurst v. Litchfield (39 N. Y. 377), applied this principle in a case almost exactly identical with the one at bar. At a later period in the reference, however, the case of Delaware, &c. Co. v. Pennsylvania Coal Co. (50 N. Y, 250), was called to the attention of the referee. That case, while reiterating the general rule that “an agreement to refer all matters of difference or dispute that may arise to arbitration will not oust a court of law or ■equity of jurisdiction,” seems to draw a distinction between that class of cases in which “ the parties undertake, by an independent covenant or agreement, to provide for an adjustment and settlement of all disputes and differences by arbitration to the exclusion of the courts,” and the class in which “they merely, by the same agreement which creates the liability or gives the right, qualify the right by providing that before a right of action shall accrue, certain facts shall be de *11 termined or amounts and values ascertained, and this is made a condition precedent either in terms or by necessary implication” (p. 266). The case of Hurst y. Litchfield is considered in the opinion and practically overruled, and I am not able to distinguish in principle the agreement to arbitrate in the case at bar, from that in the case of Delaware, &c. Co. y. Pennsylvania Coal Co. The latter case is therefore controlling, and if there were no other reply to be made to this defense, it would, so far as the claim for extra work is concerned, be fatal to it.
But I am not able to find any proof m this case that any dispute did arise between these parties respecting the true value of the extra work, or of the works omitted. It must be borne in mind that this provision for arbitration applied only to a very narrow subject of dispute. The contract, after providing for the construction of the building and for the price to be paid therefor, provided that if any dispute arose respecting the true construction or meaning of the drawings or specifications, the same should be decided by the architect; that the work should be done to his satisfaction and under his direction, to be testified by a certificate under his hand, and that the payments should be made in installments, in each case, upon such certificate. It will thus be seen that the architect was to decide substantially all disputes about the fulfillment of the work under the contract, and in conformity with fhepjlans and specifications. But the contract contained also a clause permitting the owner, at any time during the progress of the building, to request any alteration, deviation, additions, or omissions from the said contract, and that the same should not affect or make void the contract, but should be «added or deducted from the amount of the contract, as the case might be, by a fair and reasonable valuation. And it was only in case of such additions or omissions and of *12 a dispute as to their value, that an arbitration was provided for. Now, it appears in evidence that at the time the work was claimed to be completed by the plaintiffs, the defendant Little expressed general dissatisfaction with the work; but it does not appear that he ever distinguished between the extra work and the work done under the contracts, or disputed the value of any specific item of extra work or of any work omitted. About a fortnight after the last certificate was' given, and after Mr. Little had expressed dissatisfaction with the work, and referred Mr. Weeks to his counsel, Mr. Jackson, an interview took place between Mr. Weeks and Mr. Jackson, at which Mr. Jackson had a written list of alleged faults and shortcomings in the building. He read from this list to Mr. Weeks, and insisted that those alleged faults should be corrected, but none of the items of complaint upon that list related to the value of extra work or of omissions. There is no other proof in the case of what specific things Mr. Little was at that time dissatisfied with; at this interview Mr. Jackson in Mr. Little’s behalf proposed an arbitration to Mr. Weeks, pursuant to the provision of the contract. Mr. Weeks asserted that there was nothing to arbitrate, that there had never been any dispute about the value of his extra work or of the work omitted, and Mr. Jackson thereupon asserted that the extra work was disputed. But it does not appear that he then pointed out any item of extra work or of work omitted, the value of which he disputed. An assertion that a dispute exists does not make one. It appears in evidence that most of the extra work was done at a price agreed upon between the parties ; that being so, no dispute could arise as to its value, whatever fault might be found with its character. The work might not be properly done, but, if done, its value was fixed ; there were therefore certain portions of the bill for extra work that could not *13 be affected by the agreement to arbitrate. If other items were covered by it, the burden of proof was on the party alleging it to show it, and that has not been done in this case.
The general character and the value or agreed price of the extra work has been proved in this case, and none of the very few objections made to the extra work seem to me well taken. I think the plaintiff entitled to recover the amount of the extra bill, less certain deductions admitted to be proper by all the parties, such as Henratty’s bill, which was paid by Mr. Little after this suit was begun, &c.
The next question of importance in the case is the effect of the architect’s certificate.* The case of Glacius v. Black (50 N. Y. 145), upon which the defendant relies, contains expressions which give some countenance to the claim that in such a case the architect’s certificate is not of itself conclusive upon the parties, *14 and that his acceptance of different work or inferior materials from. that contracted for would not bind the owner to pay for them. The facts stated in that case tending to show that there had not been in point of fact any acceptance of the work by the architect would alone seem to have authorized the decision of the court. But aside from that the court expressly distinguishes the case of Glacius v. Black from Wyckoff v. Myers (44 N. Y. 143), in which an architect’s certificate was held conclusive in the absence of fraud or mistake. The court does not overrule Wyckoff v. Myers, but substantially affirms it in all cases to which it is applicable. The language of the contract in regard to the architect’s certificate in the case at bar, is so exactly identical with that in Wyckoff v. Myers that it is evident either that the same printed form of contract was used in each case, or that the contract in this case was drafted with the case of Wyckoff v. Myers before the draughtsman, and that he borrowed the expressions in regard to arbitration from the contract in that case, with the purpose of having them governed by it. In either event the decision in Wyckoff v. Myers is almost as controlling in the interpretation of the contract in this case as if it had been rendered in a suit brought directly upon it. The general doctrine that an architect’s certificate under such a contract is conclusive, in the absence of fraud or mistake, has been held in many other cases, and the case of Glacius v. Black, does not, in my opinion, require any different rule to be applied in this case.
It is contended in the next place that the certificate which was given was not conclusive because it appeared upon its face that some of the work was not done. The certificate states that the last coat of painting in six of the suites of apartments, which were then occupied by tenants, was not finished, and recommends the withholding of $180 from the last pay *15 ment, with which to pay for such work whenever "it may be done. It appears that the apartments were occupied, and it was thought best not to paint them until the tenants went out or were ready to have such painting done. The plaintiffs were ready to do the-painting, but it was omitted, and' the cost of it deducted to accommodate all parties. I do not think that the insertion of such a clause in the certificate had the effect to invalidate it or to alter its legal effect.
It is also claimed that the certificate was not conclusive, because the architect did not himself regard it as such. A letter * has been put. in evidence, written by Mr. Gilman to Mr. Little after the last certificate was given to Mr. Weeks, in which Mr. Gilman stated that the certificate did not conclude, and was not intended to conclude, any just rebate or offsets which may be shown to exist in the condition of the work. This letter was admitted as a declaration of Mr. Gilman, which might contain admissions bear ing on the issue of fraud in giving his certificate. I do-not think that the conclusiveness .of a certificate can be impeached by proof of admissions made by the architect after its delivery, to the effect that he did not *16 consider it conclusive, nor can mere proof of the architect’s belief at the time he issued it, that it did not, in law, conclude the parties, in any way invalidate it. Hr. Weeks had a right to the certificate if the work was done, and if the certificate was given without fraud or mistake, Mr. Gilman’s ideas as to its effect did not in any way impair Mr. Week’s legal rights under it. The law determined that.
The architect’s certificate, then, is conclusive, upon the plaintiff’ s right to recover the balance, due under the contracts, unless it was given fraudulently or by mistake. The defendant alleges that it was so given, and the principal controversy in the case has been upon that point.
There is no proof tending to show that the certificate was given by mistake.
The plaintiffs applied to Mr. Gilman for a certificate in the early part of November. Mr. Gilman examined the premises and made out a written list of things to be done, which was dated November 16, and gave it to Mr. Weeks. He also obtained from Mr. Jones, the janitor of the building, who had formerly been a carpenter, a similar list, which he also gave Mr. Weeks. In December, he twice personally made a thorough examination of the building, once with Mr. Crooks, an architect, and once alone. He also had two others, Mr. Harnett, an experienced architect, and Mr. Keeley, an old and experienced builder, examine the house. He knew that the defendant was dissatisfied. Finally, on December 20, he wrote to Mr. Jackson, stating that if there were shortcomings'in the work which he had been unable to détect, he would be glad to have a list of them. He thereupon received a reply in which Mr. Jackson refused to furnish any list. He then, on December 24, executed the certificate and delivered it to Mr. Weeks. After doing so, however, he asked Mr. Weeks to withhold it a few days, and on December 27, *17 he finally issued it to Mr. Weeks. There is, therefore, in my opinion, no basis for any claim that he acted under any mistake, or without such a thorough examination and knowledge of the work as would enable him to form an accurate judgment upon the question of its completion.
Nor is' there in this case any testimony tending to afford what may be called direct' proof of fraud. A large amount of testimony has been taken in regard to the actual condition of the building, the defendant claiming that the faults in it were so gross and so obvious as to justify the inference that the architect acted fraudulently in certifying to its completion. The effect of this testimony will be considered later, but aside from it there is, in my opinion, no testimony Avhatever tending to prove that the architect acted fraudulently in giving the certificate.
The defendant’s counsel contends that the fact that the architect did not discover or make known the insufficiency of the walls when the first contract was made, and prepared specifications which are alleged to have been vague and lacking in precision, are proof that he acted fraudulently in giving the certificate. They may or may not be facts of which Mr. Little can complain, but I do not see that, they have any connection with the. giving of the certificate. It is also claimed that the change of the date of the certificate affords proof of fraud, but I can see in that act nothing but a natural desire to avoid irritating Mr. Little, whom Mr. Gilman knew to be somewhat dissatisfied. So it is claimed that the certificate was given furtively, without notice to Mr. Little. But it seems to me that Mr. Gilman’s letter of December 20, to Mr. Jackson, was sufficient notice that Mr. Gilman thought the work completed. There is no proof of any conspiracy or collusion between Mr. Gilman and the plaintiffs. There is no proof that Mr. Gilman was under any obligations to the plaintiffs *18 or had any reason to expect any advantage from violating his duty to Mr. Little, or that he ever, in fact, received any benefit whatever by reason of giving the certificate. There is an entire absence of proof of any motive for Mr. Gilman to do an act not only so dishonorable in itself, but ruinous to his professional reputation. At the same time fraud often can be proved only indirectly, and the condition of any building might be such, that it alone would constitute conclusive proof that an architect had acted fraudulently in giving a certificate that the contract for its construction had been properly performed.
In considering the effect of the defendant’s testimony in regard to the condition of the building it is proper to say at the outset that considerable testimony has been given in regard to deviations from the plans and specifications, which is fully explained by the fact that such deviations were agreed upon in the course of the work. Other apparent deviations from what are known as the second set of plans are also explained by the fact that the second set of plans contain some things indicated as to be done, which were drawn upon them, but were not in fact decided to be inserted.
The architect at the outset prepared a set of plans and specifications based upon the idea of using certain walls and portions of the old houses on the premises. These plans and specifications were signed as a part of the contract. Afterwards it was decided to entirely demolish the old buildings and to build anew, and additional stories were also subsequently added. A new set of plans were thereupon drafted, but were not signed, and no new specifications were prepared, but the old specifications seem to have been applied to the new plans. Mr. Buckingham, an architect-,' who has testified with clearness and precision in regard to the *19 alleged defects, became acquainted with the house after the building was completed, and based his-testimony upon the theory that whenever the details shown upon the plans and specifications were not complied with the plaintiff had not performed his contract. But, in fact, in this building, as in almost all cases, changes of detail were made as the work progressed, and these changes appear still greater from the looseness with which the final plans were treated, and the absence of new specifications to accompany them. For instance, Mr. Buckingham specifies the following apparent deviations from the plans and specifications : that there are no outside blinds ; that the lintels over the kitchen fireplaces are not of full width, and the plaster work about them improper ; that certain gas-pipes are not correctly placed ; that the linen closets were omitted; that the janitor’s bath-room was unfinished ; that there were no tiles on certain architrave blocks ; that the butlers’ pantries were nowhere according to the plans; that the iron-work shows marks of the sand in casting; that the windows on 17th street are four inches too high ; that the transom lights had no cords, &c. Each one of these apparent deviations from the plans, and a number of similar ones, are explained by testimony on the part of plaintiffs, that alterations were decided upon during the progress of the work, which testimony is nob denied by Mr. Little.
The most serious faults in the building are those resulting from settlements. There are three distinct parts of the building where settlements occur, one in the east suite, one in the library of the south suite, and one about the light-shaft. The effect of these settlements is to make the floors and ceilings slope down towards the point of sinkage, to crack the plastering, to make the frames of doors and other trimming out of level, to make the doors bind, &c. These results ap *20 pear in each suite affected, from the lower stories to the top of the house, the higher the story, the more notable being the damage.
The effect, particularly in the upper- stories, is most serious. A number, of the floors and' ceilings there have such a slope that it is palpable at a glance, the' frames of doors are so out of level that it will be necessary to take them out of the wall to straighten them, and to replaster around them when they are,put back, as has already been done in a number of instanc s. There are several doors there which have become so deflected that when they are shut in the frame of the door there remains an open space over the top of i e door. The cracks in the walls are very large and extensive. Some cracks in the uppermost stories were, I should think, more than one inch in width. In short, the consequences of these sinkages are very detrimental to the house, and I have no hesitation in saying, that if they were due to any acts or omissions of the plaintiffs in violation of the contract, I should hold that the architect’s certificate had been fraudulently obtained by the plaintiffs, and was invalid.
But I am convinced that these sinkages are not due to any violation of the contract by the plaintiffs. They are due, in my opinion, to the character of the plan itself and the weakness of the construction in accordance with it. Mr. Gilman and other witnesses for plaintiff have given much testimony in explanation of this matter. It is generally to the effect that Mr. Little was unwilling to incur the expense which the use of iron beams would have entailed, and was desirous of having open stores on the first floor. He was therefore obliged to use wooden beams, and was not able to run up the usual brick partitions from the cellar under the partitions on the upper stories. Mr. Gilman says that this style of construction necessarily involved some sinkage, and it clearly appears in testimony that *21 he warned Mr.. Little that sinkages would occur, and that he must expect to expend at least five per cent, of the original cost of construction in overhauling the building within a year or two after it was finished. Mr. Little states that he knew that all new buildings had to be overhauled, but that Mr. Gilman said nothing to him indicating that any unusual sinkages would occur, or unusual overhauling would be necessary. Mr. Gilman is not a party to this action, and it is no part of my duty to pass on the sufficiency of his explanation. It is sufficient that the plaintiffs were not responsible for the sinkages, and if any one else was responsible for them, there is no justice in making the plaintiffs pay for the damage they have caused.
The next most serious fault asserted by the defendant, in the construction of the house, is the general carelessness and roughness of the finish of the woodwork. It appears in testimony and is evident upon inspection that the moldings, panels and trimming, generally, of the woodwork throughout the house, were to a certain extent rough and carelessly done ; in some places the mark of the saw is apparent on the wood ; the windows in some places leaked ; the trim in some places was not level, and generally in my opinion the finish of the woodwork was of quite an ordinary character ; in the six apartments which had not received the last sandpapering and coat of paint provided for in the last certificate, the woodwork is admitted by all parties to have been improperly finished. In the other apartments, however, whatever criticisms may be made upon the work, I cannot hold that the finish was so faulty as to require the inference that the architect acted fraudulently in giving the certificate. The architect originally exercised his judgment in the matter. A large quantity of the woodwork which was sent to the house was rejected and sent back to the mill, and presumably that which remained was deemed satisfac *22 tory. The question is not what I think of the work on the merits, or whether the architect erred in judgment, but whether the work is so bad, that it, of itself, proves that the architect gave the certificate knowing that he violated his trust in doing so.
The other faults referred to by Mr. Buckingham and the defendants’ other witnesses seem to me much less important than either the sinkages or the roughness of the finish of the woodwork. The principal objections which he makes and which have not been referred to are that the caps of certain soil-pipes were not properly soldered, that certain sash were improperly weighted, that some sliding-doors stuck, that some window catches were put on the wrong side of the window, that the fan-lights over doors had plain glass instead of ground glass, that there were in some windows soft pine parting strips, that some wash-tubs-leaked, that some trap-doors in the balconies could not be lifted, that the moulding around the wire netting of the elevator doors was too small, that the saddle of the elevator door projected too much, that certain roof sky-lights leaked, that the concrete cellar floor was bad in spots, that certain ventilator pipes were faulty, that some of the water-closet pulls needed to have a screw put in another place, that certain sash was VÁ inch in width and not 1M inch ; that all sash was too narrow, that the glass in the main door was decorated by a sand-blast process instead of being engraved by hand, that the glass throughout was poor in quality, that the basement stairs were unsuitably finished, that some architrave blocks do not match, that some dumb-waiter doors are other doors cut down, that the main balustrade rocks, that there is no gutter on the edge of the roof, that the library flue in the east suite does not draw,. that some flues leak, that the boiler pipes are brass instead of copper, that certain sinks have traps in the leg instead of outside traps, *23 that the boiler stands are too large, that the bay-window is not plumb or level, that the foot rails of certain sash are too heavy, that certain beams are not sufficiently bridged, that certain trimmers are not spiked together, that the bridging was in places insufficient, that certain openings in the sewer were improperly covered, that there was no street washer, that the basement steps were not properly bolted, that certain valves were omitted in boiler pipes, and that the hand rails and balustrades of the stairs were unsuitable.
This list seems formidable by its length, but most of these alleged faults are satisfactorily explained ; in some cases the method of construction alleged to have been faulty was expressly directed by the architect, in other cases the work complained of was extra work not undertaken by the- plaintiffs at all, in others the work was originally well done and afterwards torn up by other parties and not left in good order, in others certain things the omission of which is alleged as a fault were not required to be furnished by the contracts, in others it is a question of doubt what the plans and specifications did call for upon which by the contract the architect’s conclusion was final, in others the fact alleged is denied, and in many cases the faults complained of are of themselves trivial.
Upon the whole, therefore, I think the architect’s certificate is conclusive. Fraud is never presumed. It must be proved. The burden is on the defendant to prove it in this case, and I thing he has failed to overthrow the legal presumption that the architect, in giving the final certificate, did not act in violation of his duty to his employer.
The original contract provided that the building should be completed on September 1, 1877, and that for each day after that date that the work should remain unfinished, the plaintiffs should pay the owners $20 a day as liquidated damages, and not as a penalty, *24 time being declared to be an essential element of the contract.
The same contract contains a clause providing that, “should the owner at any time during the progress of the said building request any alteration, deviation, additions, or omissions from the said contract, he shall be at liberty to do so, and the same shall, in no way, affect or make void the contract,” etc.
After the work had progressed a few weeks under this contract, it became evident that the Avails of the old buildings could not be used in the new one, and that alterations -in the contract would be necessary. Various alterations were discussed for some weeks, and at length certain alterations were decided on. Ultimately, two stories, in addition to Avhat were originally contemplated, were added. At some time, when some of these additions were under discussion, an interview took place between Mr. Jackson, Mr. Weeks,' and Mr. Little, at which it was agreed that the plaintiffs, in case certain additional ■ work should be done, should be allowed one month, or till October 1, in addition to the time fixed by the contract, in which to complete the work. The witnesses differ as to the time of that conversation ; the defendant’s witnesses putting it at the time of the execution of the acceptance of the second contract, and the plaintiff’s witnesses putting it early in the work. There is nothing in which the memory is more treacherous than dates, and I think, from Mr. Candee’s testimony and from some other circumstances, that the conversation in question took place early in the work, before the entire work ultimately done was decided upon, and that the additional four Aveeks spoken of as necessary for the completion of the extra work referred to the extra work then contemplated, which was much less than was ultimately done. But if the additional month then spoken of did refer only to the work then con *25 templated, that is not, I think, decisive of the question. The plaintiffs contend that, if additional work was later agreed upon, an agreement for an extension of time necessary to complete the addional work is to be implied. It is argued that, in any modification of the original contract providing, for additional work, the provision in regard to liquidated damages cannot be inferred as a part of the supplementary contract, and must be proved affirmatively to have been made a part of the supplementary contract. This would be true if the original contract contained no other provision on the subject than the clause providing for liquidated damages. But the clause which provides that any alterations or additions to the work, “ shall in no way affect or make void the contract,” seems to me to entirely change the case. The party who alleges that any subsequent agreement providing alterations or additions did in fact “affect and make void ” the provision of the contract providing for liquidated, damages must prove it. If no agreement had been made extending the time, the whole building with its additional stories must have been finished on September 1. Mr. Weeks admits that there was no specific agreement extending the time later than the additional month, and Mr. Little asserts that he understood the conversation about the additional month to apply to the entire additional work. He had a right to assume it if Mr. Weeks did not see to it that a definite agreement was made extending the time still further. There is no sufficient proof of a waiver by Mr. Little of the liquidated damage clause. The letter written to Mr. Weeks at Mr. Weeks’s request would afford some proof of such waiver if it had been unsolicited; but I do not think that a letter, written, not necessarily to express the writter’s own opinion, but to be used by the person to whom it was written for another purpose, can be regarded as containing admissions of much *26 weight. A waiver must be clearly proved, and I do not think it has been proved in. this case. The defendant, therefore, should be allowed a deduction of $20 a day from each day from October 1 to December 24, the date when the work was in fact completed to the satisfaction of the architect.
The other counter-claims of the defendant are not admissible. The damages were liquidated at $20 a day. If, in addition, the defendant could be allowed to prove actual damages, the provision for liquidated damages would be nothing but a penalty.
The following statement shows the amount which in my opinion is due to the plaintiffs:
Total amount due plaintiffs is, with interest from December 27, 1877 .... $8,551 76
The amount of the claim of the defendants Spitz & Henschel and the validity of their lien are not disputed by anybody. The amount due them is $308.11, with interest from December 27, 1877, and as their lien was filed first it is entitled to priority over the others.
The defendant Eiker asserts no claim in this action and disclaims any lien on the property.
The defendant Mayhew claims to recover $92.50 for a balance due on his contract, and $658.67 for extra work. He made a contract with Hiker to furnish all materials and do the work of painting, etc., according to specification and to the satisfaction of the architect. The specifications required that all the interior pine finish be painted with three good coats in the best manner.
The plaintiffs in their general contract with the owners contracted to build the entire building, and were responsible to them for its completion. The plaintiffs made a contract with 'Hiker for the carpenter work, which included painting, and Hiker made another contract with Mayhew for the painting. May- *27 hew did not perform his contract to the satisfaction of the architect, and Weeks employed other painters to complete it and paid them for such work nearly $200, charging the amount to Biker; nothing therefore is due to Mayhew on his original contract, and he has no lien upon the premises in respect to it. After the painting had proceeded a while Mayhew asserted that the interior of the building was painted with three coats. The work was not satisfactory, and the architect would not accept it. Biker thereupon made an agreement with Mayhew whereby Mayhew agreed to put on another coat of paint throughout for a stipulated price, and that work is called in this action the extra work. There is no proof that the owner ever authorized this extra work, and from the fact that the architect would not give a certificate without it, it is to be inferred that he either thought the three coats had not been put on or that the work had been improperly done. Under these circumstances I cannot see that Mayhew can have any lien on the building for this extra work. Mayhew claims, however, to recover a personal judgment against Biker for the amount. Biker admits that he made the contract for the so-called fourth coat, but defends this claim on the ground that Mayhew fraudulently stated to him that three coats of paint had been put on when in. fact they had not been put on. Mayhew undoubtedly did represent to Biker that the three coats had been put on, and his right to recover, therefore, rests on the question whether they had been put on or not.
Upon this point the testimony is quite conflicting. A number of men employed by Mayhew testify that the three coats were substantially put on throughout the house. Two witnesses, however—William Bichards and James Bichards, to whom Mayhew sublet the painting of two floors testified that Mayhew told them, after two coats were put on— that the work looked *28 well enough, and not to put on a third coat, and that they followed his directions. They were apparently truthful witnesses, and their testimony was not contradicted by Mr. Mayhew, who afterwards testified upon other points. Mr. Gambling, who was employed to complete some of Mayhew" s work, and Mr. Weeks also testified that the three coats in many places had not been put on. If they had properly been put on, I. cannot see the necessity for a fourth coat. The witnesses in Mayhew’s behalf explained this by the assertion that the woodwork was finished so roughly that they could not make agood job of the painting. But it appears in evidence that in all cases painters, as a part of their contract, have to sandpaper and putty woodwork to some extent, and understand it to be a part of their duty to do so. Undoubtedly there is an implied understanding, when a painter contracts to paint the inside woodwork of a house, that the wood shall be to a reasonable extent smooth and finished. But Mayhew could see the condition of this woodwork before he began. If it was rough to an unusual degree he should have insisted on its being made smooth before he began. If he undertook the job at all he should have sandpapered it down so as to produce the right finish, and if he had done so, three good coats of paint ought to have been enough. I am constrained to hold that Hiker’s contract to pay for the extra work was obtained upon a misstatement of a material fact, and that Mayhew is not entitled to recover for it at all.
The judgment to be entered, therefore, should provide that the defendants Spitz & Henschel are entitled to recover $308.11, with interest from Becember 27, 1877, and their costs, and have a lien for such amount upon the premises mentioned in the complaint, and that their lien is prior in rank to that of any parties in this action; that, the plaintiffs are entitled to recover *29 $8,551.76, with interest from December 27, 1877, and their costs, and have a lien for such amount upon said premises, second in rank to that of Spitz & Henschel; that the defendant Hiker is not entitled to recover anything by reason of. work done upon said premises, and has no lien upon said premises, but is entitled to a personal judgment for costs against the defendant May-hew; that the defendant Mayhew is not entitled to recover any sum whatever against any party to this action, and has no lien upon said premises ; that the owners’ equity of redemption in said premises should be foreclosed and the said premises sold to satisfy said liens of Spitz & Henschel and of the plaintiffs ; that out of the proceeds of said sale the expenses thereof be first paid ; that out of the residue, if any, the said amount due Spitz & Henschel be next paid; that out of the residue, if any, the said amount due the plaintiffs be next paid, and that the residue, if any, then remaining, be paid to the defendant Little; that in case the proceeds of said sale should be insufficient to pay said amount due to Spitz & Henschel, a personal judgment for the deficiency should be entered in their favor against the defendant Little, both individually, and as executors, &c., against the plaintiffs and against the defendant, Hiker ; and that, in case the residue applicable to the payment of the plaintiffs’ claim be insufficient therefor, a personal judgment for the deficiency should be entered against the defendant Little, both individually and as such executor.
Judgment was entered in conformity with the views of the referee.
From such judgment the plaintiff and defendant Little appealed.
The defendant Little appealed from the whole judgment.
The plaintiff from so much as adjudged them in *30 debted to the Littles for liquidated damages in the sum of $1,700.
It. W. Be Forest, for plaintiffs.
Jackson <6 Martine, attorneys, and Okas. A. Jackson, of counsel, for defendants.
Pee Curiam.
This is an action upon a claim filed under the mechanic’s lien law. The case was tried be-for a referee and is unusually voluminous. It consists of- about three thousand seven hundred folios and about fifty requests of facts to find. The learned referee in his opinion has disposed in detail of all the questions in controversy, and his findings of fact from the evidence and conclusions of law from the facts found seem to be clearly and concisely stated. .
After a- careful examination of all the evidence in the case we have reached the conclusion arrived at by the learned referee of the general doctrine, which falls within the case of Wyckoff v. Myers, 44 N. Y. 143, that the architect’s certificate under such a contract is conclusive, in the absence of fraud or mistake, and does not -call for a different rule to be applied in this case.
Judgment affirmed on opinion of the referee.

 The certificate was as follows:
“New York, December 37; 1877.
“I certify that the sum of six thousand one hundred and forty-eight dollars (§6,148), being the eleventh and last payment to D. 0. & F. M. Weeks under their contract of February 33, 1877, made with Mrs. Augusta M. Little and Wm. McCarty Little, Esq., for work and materials on the new buildings, Nos. 46 and 48 Union square, said eleventh payment being due “when the work is completed according to plans and specifications,” is now due accordingly, the terms of the contract having, in my judgment, been fully complied with.
“And on the second contract between the same parties, bearing date April 34, 1877, I find the final sum of four thousand one hundred and four dollars (§4,104), to be now due in like manner.
“Note, however, that six of the suites in the house being occupied at the time of the fourth coat of paint being put on, could not be painted over with said fourth coat, the sum of §30 for each suit, or §180 in all, shall be retained by the owners for the purpose of putting said six suits in good order and condition, as regards the painting of the same during the next summer, or whenever the rooms shall be unoccupied, so as to allow of the work being properly done.
“Arthur Gilman, Architect.”

 The letter was as follows:
“Dear Sir—In giving Mr. Weeks his final certificate on the contract, which, after the most mature reflection, appeared to me to be only my simple duty, I trust you will understand that it by no means concludes, or is intended to conclude, any just rebate or offset which may be shown to exist in the condition of the work. With perhaps some, very trifling matters, which may be the subject of explanation, the whole work appeared to me to be such as to demand a general approval. But in case of any matters to which your attention may have been more immediately drawn, from the fact of living in the house, if any such there are which justly demand a further attention on the part of the contractor, I am sure that you will find Mr. Weeks quite as anxious to have them satisfactorily adjusted as either you or I may be to see that they are properly done.
“Very truly yours,
“Arthur Gilman.
“W. McC. Little, Esq.